**UNITED STATES of America,**

v.

**BADALAMENTI, et al., Defendants.**

**No. 84 Cr. 236 (PNL).**

United States District Court, S.D. New York.

June 26, 1987.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for the U.S.

Michael Kennedy, New York City, for defendant Gaetano Badalamenti.

Ivan Fisher, New York City, for defendant Salvatore Catalano.

MEMORANDUM AND ORDER

LEVAL, District Judge.

Gaetano Badalamenti moves for a mistrial based on the court's removal for cause of Juror No. 313, over defense objections,

after the juror's daughter had received a threatening telephone call during deliberations and on the on-court's decision to proceed thereafter with 11 jurors, rather than adding an alternate to the deliberating jury. Salvatore Catalano moves for a further interview of Juror No. 313. The motions are denied.

The facts briefly stated are as follows. After 17 months of trial, at 9:00 a.m. on the second day of jury deliberations, the Marshal reported to the court that Juror No. 313's daughter had received a threatening telephone call at her place of work the previous day. The juror had learned of this on her call home to her children the previous evening from the hotel where the sequestered anonymous jury was quartered. After attempting to reassure her daughter that it was nothing to worry about, the juror herself passed a sleepless night of worry.

Upon being advised by the Marshal, I interviewed the juror. By telephone I interviewed the daughter who had received the telephone call, as well as other persons at her place of work. Because the interview of the anonymous juror necessarily would focus on her family information, and because of the sensitivity of the matter for her, the interview was conducted by the court alone, on the record but without counsel present.

The caller had apparently said to the young woman words to the effect that he "knew who she was, he had been watching her, he wanted her, and he was going to get her." (Tr. 41674.) After the daughter had hung up the phone, the man had called again. Upon my interview of the juror, she repeatedly gave evidence of being deeply upset and worried by the incident. She said the daughter who received the call "wasn't going to tell me about it" (presumably so as not to frighten her mother) but the news had been given her by a younger sister. "I'm not saying its anything related [to the trial]. I don't know.... It just kind of upset me, that's all.... And I was concerned about it. I wasn't even going to mention it, but this morning I kind of got upset in reference to it...." (Tr. 41673.) When asked whether she had gotten from her daughter a description of the man's voice, she said "No, not really. I think I got really too upset—you know, it upset me and I got really too upset to ask her...." And when asked how this had "affected you as a juror, if at all?" She answered, "As to my ability to perform as a juror, it hasn't affected me. It's just, you know, my children are my life. You know, I'm more concerned about her than anything else, her being okay. Other than that, it hasn't affected my ability to think or to judge in any way." (Tr. 41676.) When asked repeatedly whether she had told any other jurors anything about the event, she gave firm repeated assurance that she had made no mention of it to any juror. She said also, "You know, I was reluctant because I know that—you know, it's touch and go with some of the jurors as far as being concerned." (Tr. 41677.)

Half the day was consumed in proceedings over what should be done, with deliberations stalled. First, the court convened counsel to advise them of what had happened. [This was done in the robing room to diminish the risk of the press reporting the incident, frightening other jurors and their families and thereby causing a risk of mistrial. This precaution was rendered futile, however, by lawyers who, similarly perceiving the risk of mistrial but assessing differently its desirability, promptly advised the press of the occurrence.] After briefing by the court, defense counsel withdrew to caucus on their strategy. Following their caucus, the court reconvened and heated argument was heard as to what should be done. Defense counsel vigorously opposed the Government's motion to excuse the juror. Argument was also heard as to what would be done if the juror were excused, *i.e.*, whether deliberations would resume by 11 jurors as Rule 23(b) prescribes, or whether the first of the alternates (who were being held for emergencies) would join the jury with instructions

that deliberations start anew. The defendants argued in favor of adding the alternate, the Government in favor of continuing with eleven. After the session of argument, the court withdrew to consider its decision. I then reconvened counsel and announced my decision to excuse the juror and proceed as the rule specifies with 11 jurors. Argument was then heard on the application of some defense counsel, opposed by other defense counsel and by the Government, for the taking of any partial verdicts reached on the previous day before Juror No. 313 learned of the incident. At 1:30 p.m., after having sat in idleness for 4½ hours, the 11 remaining jurors were instructed to resume deliberations. The defendants moved for a mistrial.

### Discussion

1. *Excusal and Reinterview of Juror No. 313*

■ Defendants now contend that the juror should be reinterviewed. The purpose of the interview from the defendant's point of view would be the hope of eliciting testimony that the juror had been willing and able to continue serving fairly and also to elicit any information since received that might show that the threatening call was unrelated to the trial.

The juror was excused for reasons that could not have been answered by further inquiry then, much less now, three months later.

My reasons for excusing the juror were the following: First, and most important, the risk of Juror 313 telling other jurors what had happened simply could not be taken. The possibility of mistrial was too great. Of course she could be instructed not to tell. But where the issue concerns something emotionally so basic as fear for the safety of one's family and children, I could not be confident that in the emotional tension of jury deliberations the juror would not let slip this piece of information.

Had it come out, it would almost certainly have meant a mistrial after 17 months of trial. All of the jurors were undoubtedly worried about their families after hearing extensive evidence of Mafia murders. The jurors themselves were sequestered in the Marshal's care, but their families were unprotected. For them to learn that a juror's daughter had received an anonymous threatening telephone call would likely have caused panic. This was a risk that could not be reasonably taken.

Second, the juror was obviously worried, troubled and upset, and repeatedly said so.

Third, in these circumstances, it is questionable how much credit the court could give to a juror's statement that she would not be affected. This was very different from the commonplace problem that occurs when a juror has learned a piece of out-of-court information. When such a juror gives assurance of ability to decide fairly and solely on the evidence, courts often accept the assurance and retain the juror. A threat to the safety of one's child, however, cannot be put out of mind or disregarded. Even if the juror had made unequivocal statements of confidence in her ability to continue deliberating, this would give little assurance of how she would react as her fears continued to prey upon her. This juror's statement of her ability to continue was expressly qualified by her repetition of her concern for the children's safety.

I decided at the time for those reasons that further inquiry of the juror would serve no purpose. Defendants contend the inquiry I conducted of the juror was not sufficiently probing and that it was error requiring mistrial to dismiss the juror. In my view, further inquiry could not have answered satisfactorily the concerns described above that required excusing the juror. Further inquiry, followed by further argument would only have further delayed the deliberations without changing my decision on Juror 313.

It must also be recognized that in such circumstances the court cannot ask probing questions. For probing questions dealing directly with the likely subject of the juror's fears might prompt or exacerbate the fears; and if such questions were asked, adversary counsel would surely charge the court with having inflamed the juror's emotions.

Further inquiry of the juror now three months later would serve no purpose whatsoever. Assuming that information subsequently acquired made clear that the incident had nothing to do with the trial, and that a hearing now would bring this out, the information was not available at the time. It has no bearing on the correctness of the court's ruling when it was made. In any event, the juror was not excused because of any conclusion on the court's part that the telephone call was related to the trial. I had no way of knowing whether it was or it wasn't, and nor did the juror. The problem was rather that this juror and others would speculate on the possibility and such speculation would have been devastating to deliberations.

In my opinion, the circumstances required grant of the Government's application. It would have been unreasonable to require the Government to bear the risk that the juror might be intimidated, as well as the risk that the juror might tell others and provoke a mistrial.

2. *Denial of Defense Application to Add an Alternate*

■ The motion for a mistrial based on the denial of defendants' application to bring an alternate into the deliberating jury is frivolous. The Federal Rules of Criminal Procedure were recently modified after careful consideration of the course to be followed in these circumstances. The 1983 amendment to Rule 23(b) expressly provides that if a juror is excused for cause during deliberations, the court has discretion to receive a verdict from the remaining eleven jurors. The Notes of the Advisory Committee make clear that the Committee debated whether in such circumstances an alternate should be added or a verdict re-turned by eleven. The Notes underline the awkwardness and difficulty of requiring that deliberations begin anew with the new juror, and in particular the pressure on the new juror to conform to matters already settled among the others. They observe on the other hand that there is no constitutional magic in the number 12, and that a verdict rendered by eleven is not subject to serious criticism. The Rule that was adopted accordingly made express provision for the verdict of eleven, while leaving the addition of an alternate ostensibly unauthorized by law. *Compare United States v. Hillard,* 701 F.2d 1052, 1058, 1060–61 (2d Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983). The new rule and its rationale were approved by the Court of Appeals in *United States v. Stratton,* 779 F.2d 820, 831–32 (2d Cir.1985) (continuing with eleven jurors is the "preferred mechanism ... [and] the more prudent course"), *cert. denied,* —— U.S. ——, 106 S.Ct. 2285, 3277, 90 L.Ed.2d 726 (1986). There is no merit whatever to the contention that it was error, much less abuse of discretion, to proceed in accordance with the Rule.

The motions are denied.

SO ORDERED.