**UNITED STATES of America, Appellee,**

v.

**Luke J. KUSEK, Defendant–Appellant.**

**No. 174, Docket 87–1143.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 7, 1987.

Decided April 6, 1988.

Baruch Weiss, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Howard M. Shapiro, Steven A. Standiford, Bruce A. Green, Asst. U.S. Attys., of counsel), for appellee.

Joan Palermo, New York City (Louis R. Aidala, New York City, of counsel), for defendant-appellant.

Before LUMBARD, MINER, Circuit Judges, and KAUFMAN, District Judge.* ·

LUMBARD, Circuit Judge:

Luke J. Kusek was convicted of conspiracy to distribute heroin and possession of heroin, in violation of 21 U.S.C. § 846 and conspiracy to import 100 grams or more of heroin, in violation of 21 U.S.C. § 963,[1] following a jury trial which lasted more than five weeks and ended on November 2, 1986 in the District Court for the Southern District before Judge Kram. Kusek appeals from his sentence of two consecutive terms of imprisonment of five to ten years each and fines totaling $200,000. He is currently serving this sentence.

Kusek claims that (1) the government did not provide a "satisfactory explanation" for an eight-day delay between the termination of a wiretap conducted by the Delaware State Police and the sealing of the resulting tapes, which were admitted into evidence at trial; (2) the court erred by refusing to admit handwriting exemplars for comparison in the absence of a handwriting expert; (3) the government failed to establish venue in the Southern District; (4) the prosecutor failed to disclose a statement made to a law enforcement officer, in violation of Rule 16(a) of the Federal Rules of Criminal Procedure and in deprivation of his right to due process; (5) testimony of a Drug Enforcement Agency ("DEA") agent's opinions regarding intercepted coded telephone conversations was improper; (6) admission of a suppressed tape recorded conversation to impeach a defense witness violated Kusek's Fourth Amendment rights; (7) the government's use of an otherwise suppressed tape recording of two conversations between Kusek and his son to refresh Kusek's son's memory during cross-examination violated Rule 801(d)(2)(E) of the Federal Rules of Evidence and the confrontation clause of the Constitution; and (8) the court erred by not declaring a mistrial in the aftermath of a reference by a county investigator on the first day of trial to Kusek's invocation of his right to remain silent at his arrest. We affirm.

The evidence shows Kusek's participation in a heroin smuggling operation that imported heroin from the Golden Triangle (encompassing portions of Burma, Thailand and Laos) into the United States, via Nepal. Skip Morgan met Dany Thakur in a Japanese prison where they were both incarcerated on drug charges. After their release, Thakur returned to his home in Nepal and Morgan returned to Delaware. The two remained in contact and, through coded letters, made arrangements to import heroin into the United States. Morgan met Thakur and Hom Gurung, who was Thakur's Nepalese source of heroin in Montreal, Canada, in June 1983. Gurung agreed to supply heroin to Morgan, and Thakur was to receive a commission for acting as the middleman. Morgan described Kusek as his "boss" who would distribute the heroin once it reached the United States. Morgan also explained that Kusek would supply money for the operation and would sponsor Gurung's entry into the United States to make final arrangements for the importation.

A few weeks later, Kusek sent a sponsoring letter and a round trip plane ticket for Gurung to the United States embassy in Nepal. This enabled Gurung to obtain a United States visa. Gurung travelled to the United States in the fall of 1983 and lived with Kusek in New Jersey and with Morgan in Delaware until February 1984. In February 1984, Gurung left for Nepal accompanied by Kusek's son, Luke E. Kusek.

On February 10, 1984, in the course of an investigation into Morgan's local heroin trafficking, Judge John T. Walsh of the Superior Court of Delaware authorized the Delaware state police to wiretap several of Morgan's phones from February 14 to February 23. During that wiretap, the state

---

* Hon. Frank A. Kaufman, Senior District Judge, for the District of Maryland, sitting by designation.

1. Kusek was tried alone but both counts of the indictments also charged Carl Morgan, Jr., Hom Gurung and Kusek's son, Luke E. Kusek, with the same conspiracies. Two other counts named only Morgan. Luke E. Kusek testified as a defense witness at his father's trial.

police intercepted drug-related conversations in which Morgan and Kusek discussed selling narcotics and the transfer of narcotics from Morgan to Kusek's customers in the United States. The conversations also indicated that they were awaiting the arrival of three individuals from overseas (apparently Kusek's son and two Nepalese drug couriers).

The Delaware police kept Morgan under surveillance. On February 15, they followed Morgan to a meeting with Kusek in the parking lot near Kusek's office in New Jersey. There, according to a Delaware police officer who was present, Morgan removed a brown paper bag from his car and handed it to Kusek, who then placed it in his car. Morgan was also holding a yellow bag which, at trial, a police officer testified appeared to be the same yellow bag containing $9,000 in cash later found in Morgan's home.

On February 22, Delaware police followed Morgan to New Jersey where he joined Kusek and Kusek's wife. Morgan then followed the Kuseks in his car to Kennedy airport to meet Kusek's son, Gurung and Thakur, all of whom were arriving from Nepal. At the airport, Kusek's son started a brawl with the customs officials to create a diversion that allowed the two Nepalese to go through customs without being searched. After leaving the terminal, the two Nepalese drove off with Kusek and Morgan in Morgan's car.

The next day, February 23, Kusek was arrested by New Jersey authorities and Morgan was arrested by the Delaware police. Kusek's home in New Jersey was searched pursuant to a warrant. No heroin was found, but in the course of the search, police uncovered more than $45,000 in cash, scales and boxes containing thousands of small plastic bags. They also found four sealed manila envelopes containing marijuana. In Morgan's home and at his place of business, police discovered $9,000 in cash and torn-up paper which, when pieced together, showed payments between Kusek, Morgan, and a third individual.

On the day of the arrests, the wiretap authorization ended. The tapes of the conversations between Morgan and Kusek were not sealed, however, until March 2, 1984 (an eight-day delay). Over objection, Judge Kram allowed the government to introduce the tapes.

The February 1984 searches and arrests did not, however, end the importation conspiracy. In April 1984, Thakur called Kusek from Nepal and read him a list of numbers which constituted a code regarding couriers who continued to smuggle heroin into the United States. In January 1985, Thakur came to the United States to collect commissions he believed Morgan owed him. Morgan gave him some money and promised more at a later date. Apparently, Morgan kept this promise: his ex-wife later travelled to Nepal with $7,000 to $8,000 for Thakur. In June 1985, a courier involved in the importation network was arrested in San Francisco on his way to meet Gurung's brother, Narayan Gurung, in Manhattan. The courier cooperated with the DEA and, as a result, Narayan Gurung and two companions, Lalit Dewan and Nima Lama, were arrested in Manhattan. Despite these arrests, the importation operation continued and Morgan periodically paid commissions to Thakur.

In January 1986, Thakur left Nepal to go to the United States to make arrangements for an unrelated drug transaction. After Thakur was arrested by a DEA agent in Newark, he agreed to cooperate with the government and testified at trial. Thakur made a number of monitored telephone calls from Manhattan to Morgan; during these calls, he set up a meeting with Morgan in Manhattan which was videotaped by the DEA. At the meeting, Morgan and Thakur discussed the delivery of more heroin, and Morgan paid Thakur $3,000. They also discussed Kusek's son's activity in diverting customs officials at Kennedy airport which enabled the Nepalese to escape customs inspection. Morgan was arrested by DEA authorities at the end of this meeting. Kusek was not arrested until May 1, 1986.

Kusek, Morgan, Gurung and Luke E. Kusek were indicted on April 21, 1986. The first count charged them with a conspiracy to distribute heroin and possess heroin with intent to distribute it, in violation of 21 U.S.C. § 846. The second count charged the same four individuals with conspiring to import 100 or more grams of heroin in violation of 21 U.S.C. § 963. Prior to Kusek's trial, Morgan pleaded guilty to counts one and two. Gurung is a fugitive. A Nolle Prosequi was filed as to Luke E. Kusek prior to his father's trial.

At trial, the videotape of the meeting between Morgan and Thakur was introduced over objection. In addition, Special Agent John Nolan of the DEA testified as an expert on the coded conversations between Morgan and Kusek which were intercepted in February 1984. He stated that the word "paint" meant heroin, and that in his opinion the conversations between Kusek and Morgan were narcotics related.

Kusek did not testify but he did call several witnesses. A next-door neighbor of Kusek testified that Kusek had recently sold his restaurant. Luke E. Kusek testified that (1) he did not know of the two Nepalese whom Kusek and Morgan met at the airport, (2) he had no knowledge of drugs being imported, (3) he had not knowingly assisted in the importation of heroin, and (4) the scuffle in the airport was a result of the customs inspectors' mistreatment of him. In summation, although conceding that many of the items found in Kusek's home and the wiretapped conversations with Morgan were drug related, Kusek's attorney argued that the evidence was consistent with a finding that the drug involved in any conspiracy was marijuana, not heroin.

## 1. *Delay in Sealing the Tapes*

■ Kusek claims that the eight-day delay in sealing the tapes violated 18 U.S.C. § 2518(8)(a). Under that statute, wiretap evidence must be presented to a judge for sealing "[i]mmediately upon the expiration of the period of the [wiretap] order, or extensions thereof." Here, the Delaware

Deputy Attorney General, Timothy H. Barrons mistakenly believed that both police officers involved in the wiretap needed to be present at the sealing before the judge. On February 23, one of the officers was involved in dismantling the wiretap and the other in inventory and cataloging the materials seized in the searches. As a result, Barrons told Judge Walsh, the only judge in Delaware authorized to seal wiretaps, that the sealing could not take place on Friday, February 24. Barrons did not call Judge Walsh over the weekend because he did not wish to disturb him at home. He next called the judge's chambers on Tuesday, February 28, but Judge Walsh was unavailable. On Wednesday, Judge Walsh scheduled the sealing for Friday, March 2, when Barrons and two police officers could be present.

We find no error in the admission of the tapes. There is no showing of bad faith, tampering or prejudice to Kusek as a result of the delay. We accept as satisfactory the government's explanation that the delay in sealing the tapes was due to the Delaware prosecutor's misunderstanding of the requirements for sealing the tapes under Delaware law. *See United States v. Rodriguez,* 786 F.2d 472, 477 (2d Cir.1986); *United States v. Mendoza,* 574 F.2d 1373 (5th Cir.), *cert. denied,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978).

In *Rodriguez,* the Assistant United States Attorney responsible for having the tapes at issue sealed failed to present the tapes for sealing until 14 days after the wiretap terminated. Apparently, she was under the mistaken impression that her "final report" on the wiretap had to accompany the tapes at the sealing. The preparation of the report was time-consuming and she had an unusually heavy court load; these factors made the delay in sealing the tapes understandable. In finding the government's explanation of the 14–day delay satisfactory, we explained:

In most cases when (1) the government has advanced reasons for the delay, such as the need to perform administrative tasks relating to the tapes prior to sealing, (2) there is no basis for inferring

that the government sought by means of the delay to gain a tactical advantage over the defendant, or that it had any other improper motive, and (3) there has been no showing that there has been tampering with the tapes or that the defendant suffered any other prejudice as a result of the delay, the government's explanation has been accepted as satisfactory.

786 F.2d at 477.

## 2. *Rejection of Handwriting Samples*

■ Kusek's second contention is that Judge Kram erred in refusing to allow samples of Morgan's handwriting in evidence. Kusek sought to have the jury compare the handwriting on a draft of the letter sponsoring Gurung which was found in Morgan's house, apparently to persuade the jury that Kusek was doing Morgan a favor by writing the sponsoring letter for him (since Kusek had no criminal record and Morgan did).

Judge Kram excluded the handwriting exemplars on the ground that they were irrelevant. We agree. As the government points out, the only question of relevance for the jury was whether Kusek knew that sponsorship of Gurung was in furtherance of a narcotics conspiracy. Kusek's motivation for agreeing to the sponsorship was, therefore, not an issue before the jury. *See United States v. Cruz*, 797 F.2d 90, 95 (2d Cir.1986).

## 3. *Venue*

■ Next Kusek claims that venue was not properly established in the Southern District because all of the overt acts committed there occurred either after he withdrew from the conspiracy or, alternatively, were in furtherance of a conspiracy of which he was not a member.

The court submitted the withdrawal defense to the jury and they found that Kusek's involvement in the conspiracy continued after he was arrested in 1984, which covered the period when Kusek was acting in furtherance of the conspiracy in the Southern District. Thakur testified that in May 1984 (after Kusek's February 1984

arrest) the two men had a coded phone conversation relating to additional drug couriers. Gurung's brother travelled to the United States and was in constant contact with Kusek's son. When Gurung's brother was arrested in June 1985, Kusek met with Gurung to discuss his defense. In addition, the telephone conversations between Thakur and Morgan and the subsequent meeting between Morgan and Thakur in Manhattan were acts of co-conspirators in the Southern District. There was ample evidence to establish venue.

Alternatively, Kusek claims that all of the events which took place after his arrest established a wholly separate conspiracy in which he did not participate. The indictment charged Kusek with participating in two conspiracies, one to distribute, and one to import, both continuing from 1978 to 1986. As we recently pointed out in *United States v. Nersesian*, 824 F.2d 1294, 1302 (2d Cir.1987), "the issue of single versus multiple conspiracies is one which is committed to the province of a properly instructed jury," quoting *United States v. Calbas*, 821 F.2d 887, 892 (2d Cir.1987). Judge Kram instructed the jury on the issue of single versus multiple conspiracies and no exception was taken to those instructions. The jury could have reasonably concluded Kusek participated in two parallel conspiracies, spanning 1978 through 1986, and that the events transpiring in the Southern District related to both conspiracies.

## 4. *Admission of Kusek's Oral Statement*

■ Kusek's fourth argument is that Judge Kram erred in permitting the government to introduce an oral statement he made because the government had not disclosed this evidence before trial in violation of Fed.R.Crim.P. 16(a). During a search of his home following his arrest, Kusek volunteered that he knew nothing about the $33,000 in cash found by New Jersey investigators.

On February 23, 1984, Investigator Jack Walton of the Atlantic County New Jersey Prosecutor's Office and other New Jersey law enforcement officers stopped Kusek in

his automobile and accompanied him back to his home in Atlantic County. After they arrived there, Investigator Walton advised Kusek of his constitutional rights and Kusek signed a *Miranda* warning card which indicated that he did not waive his rights. When Investigator Walton asked Kusek for permission to search the home, Kusek said he wanted to call his attorney. After speaking by telephone to two lawyers, Kusek, on the advice of his lawyer, refused to consent to a search. Pursuant to a search warrant, New Jersey authorities then searched Kusek's home. Although they found no heroin, they did seize approximately $45,000 in cash from various locations in the house. They also seized numerous scales, many small plastic bags, and four sealed manila envelopes containing marijuana.

In the master bedroom, Walton and other officers discovered approximately $33,000 underneath a mattress. When Kusek, who was present in the bedroom during the search, saw the $33,000 in cash, he said he had never seen it before. The New Jersey officers did not include that brief, spontaneous statement in any written report.

Prior to trial, the government provided Kusek with discovery material, including tapes, physical evidence, and documents. Around May 1986, four months before trial, Kusek's attorney, Don Buchwald, met with the Assistant United States Attorney then in charge, who advised Buchwald that he was not aware of any post-arrest statements obtained from Kusek. In late September 1986, a different Assistant United States Attorney took over primary responsibility for the prosecution. Investigator Walton first met with and was interviewed by the government prosecutors on October 10, 1986, four days before trial. The new prosecutor first learned of Kusek's statement at about that time. The prosecutor anticipated that Kusek's defense would be that he was involved in a marijuana conspiracy, not a heroin conspiracy, because he believed that it was the only defense consistent with the marijuana and narcotics paraphernalia found in Kusek's home and with his coded telephone conversations. In light of the anticipated defense, the prose-

cutor believed that Kusek's post-arrest statement was of no evidentiary value and therefore would not be used by the government.

In his opening statement, defense counsel referred to the cash found in Kusek's home and stated that he would present evidence that Kusek owned a "cash operated restaurant" that he had just sold along with some goods and machinery. Immediately following opening statements, prior to the presentation of any evidence, the government informed defense counsel and Judge Kram of the spontaneous remark Kusek made when the officers discovered the cash under his bed. The prosecutor explained that he did not produce the defendant's statement as part of discovery because he had not intended to introduce the statement in evidence. However, in light of defense counsel's opening statement, the government now planned to introduce Kusek's statement to rebut the claim that the cash was the legitimate proceeds of a restaurant sale. After a hearing at which defense counsel cross-examined Investigator Walton concerning the circumstances of Kusek's statement, Judge Kram found that Kusek's statement about the cash was made spontaneously, and not in response to interrogation. As a result, she found that the government could introduce the statement. We find no error in the admission of the statement.

Federal Rule of Criminal Procedure 16(a)(1)(A), which governs, provides in pertinent part:

> Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant ... [and] the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest *in response to interrogation* by any person then known to the defendant to be a government agent ... (emphasis added).

Under this rule, the government is not required to provide discovery of a defendant's unrecorded, spontaneous oral state-

ments not made in response to interrogation. *See United States v. Viserto*, 596 F.2d 531, 538 (2d Cir.1979).

## 5. *Expert Testimony Concerning Drug Dealers' Jargon*

■ Kusek's fifth ground for appeal is that the district court erred in permitting Special Agent Nolan to testify as an expert that in his opinion the February 19, 1984 conversations were in code and related to the distribution of heroin.

We have frequently held that "[t]he operations of narcotics dealers are a proper subject for expert testimony under Rule 702" of the Federal Rules of Evidence. *United States v. Ginsberg*, 758 F.2d 823, 830 (2d Cir.1985), *accord United States v. Cruz, supra; United States v. Kahn*, 787 F.2d 28, 34 (2d Cir.1986); *United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *United States v. Carson*, 702 F.2d 351, 369 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983) (quoting 3 J. Weinstein & M. Berger, Weinstein's Evidence § 702[02] (1985)).

Judge Kram acted within her discretion in permitting Special Agent Nolan to testify as an expert regarding the use of codes by narcotics dealers. Agent Nolan's experience during his 16 years with the DEA was extensive, and he had been qualified as an expert on several previous occasions. *See, e.g., United States v. Nersesian*, 824 F.2d at 1307–08 (2d Cir.1987). Moreover, his testimony probably was helpful to the jurors who were likely unfamiliar with the words and phrases used by narcotics dealers to camouflage their activities. *See United States v. Borrone-Iglar*, 468 F.2d 419, 421 (2d Cir.1972), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973) (proper for trial court to admit testimony as to meaning of a coded statement). Immediately after Nolan's testimony, Judge Kram gave a clear limiting instruction that the jury could "either accept [Agent Nolan's] opinion or reject it as in [its] good judgment seems best."

## 6. *Use of Suppressed Evidence on Cross-Examination*

■ Kusek maintains that Judge Kram erred by admitting a tape recording which had previously been suppressed. The government offered the tape to impeach a defense witness. During the search of Kusek's house, police seized a tape made by Kusek of two phone conversations between Kusek and his son when his son was in Nepal with Gurung. The court suppressed the tape because the search warrant had not authorized its seizure. Kusek's son gave testimony about that conversation which varied from the tape.

The government first sought to introduce the transcript of the tape as impeachment evidence and the court permitted that use. The next day, however, before the government introduced the transcript, as impeachment evidence, Kusek's son changed his testimony dealing with portions of the taped conversations and claimed memory lapses with respect to other portions of the conversations. The government then decided to use the transcript only to refresh Kusek's son's memory regarding the events which he claimed to have forgotten. Defense counsel subsequently had the tape played for the jury so they would understand the statements in context.

In *20th Century Wear v. Sanmark–Stardust Inc.*, 747 F.2d 81, 93 n. 17 (2d Cir.1984), we held that illegally obtained evidence may be used to refresh a witness' memory. *See also Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (voluntary statements obtained in violation of *Miranda* are admissible to impeach defendant). We agree with the district court that the tape was admissible to refresh Kusek's son's memory.

## 7. *Admission of Telephone Conversations*

■ Kusek argues that Judge Kram improperly admitted monitored tape recordings of Morgan's conversations in January 1986 with Dany Thakur, who had agreed to cooperate with the government. Those conversations include preparatory telephone conversations and a subsequent con-

versation in a New York hotel room during which Morgan paid Thakur $3,000 and discussed with him a new four or five kilogram delivery. Kusek contends that the statements that Morgan made to Thakur were not coconspirator statements under Fed.R.Evid. 801(d)(2)(E), since they were purportedly made after Kusek's involvement in the conspiracy ended, or alternatively, because they were not "in furtherance" of the conspiracy.

The principles governing the admissibility of coconspirator statements are found in Fed.R.Evid. 801(d)(2)(E):

> [a] co-conspirator's statements will be admitted against the accused if the government can show by a preponderance of the evidence "that a conspiracy existed, that both the defendant and the declarant participated in it, that it was in existence at the time the statement was made, and that the statement was made in furtherance of the conspiracy."

*United States v. Katsougrakis*, 715 F.2d 769, 778 (2d Cir.1983) (quoting *United States v. Lieberman*, 637 F.2d 95, 102 (2d Cir.1980)), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). Kusek contends that in January 1986, when Morgan's statements were made, he was no longer a participant in the two conspiracies with which he was charged. We disagree because, as we have shown above, there was evidence that Kusek was a member of the two conspiracies until their end.

Kusek further argues that Morgan's statements to Thakur were not "in furtherance of the conspiracy" under Fed.R.Evid. 801(d)(2)(E). The purpose of those statements was for Morgan to arrange to pay Thakur another installment of $3,000 as part of the series of commissions that Thakur "earned" for serving as middleman, and to arrange for delivery of four or five kilograms. Surely, such conversations relating to payments to co-conspirators and arrangements for future deliveries of heroin were "in furtherance" of the conspiracy.

Kusek claims, however, that the conversation that took place during the meeting was historical narrative, and not in further-

ance of the conspiracy under Rule 801(d)(2)(E). He focuses on the portion of the conversation where Morgan described the events surrounding the return of Kusek's son, Luke E. Kusek, from Nepal. Morgan explained that he and Kusek went to the airport to pick up both Kusek's son and the two Nepalese who came with Kusek's son; that the two Nepalese and Kusek's son pretended not to know each other during the course of the search; and that while the custom agents mistakenly thought the younger Kusek was carrying the drugs, they didn't know anything about the two Nepalese. The government offered Morgan's videotaped statements both as statements against penal interest and as co-conspirator statements.

Morgan's statements were admissible as statements against penal interest. The evidence offered by the government satisfies all three conditions set forth in *United States v. Stratton*, 779 F.2d 820 (2d Cir. 1985), *cert. denied*, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986), *citing United States v. Katsougrakis*, 715 F.2d at 775, where we said:

> A declaration against interest is not excludable as hearsay if three conditions are met: (1) the declarant is unavailable as a witness; (2) the statement is sufficiently contrary to the declarant's pecuniary or penal interests that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) corroborating circumstances indicate that the statement is trustworthy.

779 F.2d at 828.

In this case, Morgan was an "unavailable" witness, since he invoked his Fifth Amendment rights when called to testify by the government. His videotaped statement was clearly against his penal interest. In the course of the videotaped conversation, Morgan paid Thakur the $3,000, warned Thakur not to "say anything that is too incriminating", described how he had tried to elude the police, and then discussed four or five more kilograms of heroin. He also described his narcotics-related trip to the airport to pick up Kusek's son. Mor-

gan was obviously admitting to facts which were against his penal interest. Lastly, the corroborating circumstances indicated that the declaration was trustworthy.

 Kusek further argues that the admission of the tapes violated the confrontation clause of the Sixth Amendment because Morgan, the declarant, was unavailable for cross-examination. We disagree. The Supreme Court recently held that "the requirements for admission under Rule 801(d)(2)(E) [for co-conspirators statements] are identical to the requirements of the Confrontation Clause, and since the statements were admissible under the Rule, there was no constitutional problem." *Bourjaily v. United States,* —— U.S. ——, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987). As we held in *Stratton,* the same is true for the exception for statements against penal interest. 779 F.2d at 830 ("a finding of reliability sufficient to admit a statement against penal interest will normally satisfy Sixth Amendment concerns").

8. *Right to Remain Silent*

■ Kusek's final contention is that Judge Kram improperly denied his motion for a mistrial following a comment by the county investigator concerning Kusek's invocation of his right to remain silent. On the first day of trial, the prosecutor questioned the county investigator about whether Kusek was read his *Miranda* rights. The investigator responded that he had read the *Miranda* warnings and Kusek had signed a card stating that he had received *Miranda* warnings. Kusek's attorney objected. Judge Kram stated that she believed that the statement had gone right over the heads of the jury. Nevertheless, she instructed the jury not to attach any significance to Walton's comment and that "[w]hat the defendant did he had a constitutional right to do ... you are not to draw any negative inference from that, you are simply to strike it from your mind." Jurors can be expected to follow such cautionary instructions. *See Richardson v. Marsh,* —— U.S. ——, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987); *Greer v. Miller,* —— U.S. ——, 107 S.Ct. 3102, 3109 & n. 8, 97 L.Ed.2d 618 (1987); *United States v. Teitler,* 802 F.2d 606, 617 (2d Cir.1986). In view of the cautionary instruction, there was no need to declare a mistrial.

Affirmed.