39 F.3d 1182
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Brett LANG, et al., Defendants-Appellants.
 Nos. 92-2487, 92-2545, 93-1415, 93-1272, 93-1254, 93-1208, 93-1211.
 United States Court of Appeals, Sixth Circuit.
 Nov. 8, 1994.
 
 Before: MARTIN, GUY, and NORRIS, Circuit Judges.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 In this consolidated appeal, Karl Wingo, Brett Lang, Kim Wingo, Otis Wingo, Ronald Wingo, Ezra Henry, Venus Coleman, and Andre Olden challenge their jury convictions for conspiracy to distribute cocaine and heroin as well as other charges related to the conspiracy.
 
 
 2
 These Appellants were part of a drug distribution "family" led by Karl Wingo and Brett Lang. Over the course of approximately four years, 1988-91, the group distributed over one kilogram of "crack" cocaine, over eleven kilograms of heroin, and over thirty kilograms of cocaine. Additionally, thirty-five kilograms of cocaine were either seized or identified as belonging to Karl Wingo's suppliers.
 
 
 3
 The primary heroin sources for the group were Richard Benson, who is not a party to this appeal, and at times Ezra Henry, who also supplied cocaine. Kim Wingo ran two different houses selling "crack" cocaine. Otis Wingo, Ronald Wingo, and Andre Olden were "runners," or distributors, for the organization. Venus Coleman, Karl's girlfriend, transported drugs and money at his direction and laundered drug money as well by placing his cars and a house in her name.
 
 
 4
 On February 23, 1990, and again on March 21, 1990, undercover DEA Agent Steven Mitchell bought heroin from Karl Wingo. Karl Wingo did not actually transfer the heroin; instead, he had Ronald Wingo do so the first time and Andre Olden the second, using the alias "Carlos." When police searched the houses used by Ezra Henry and Kim Wingo, arrested Karl Wingo and Brett Lang, and stopped Ezra Henry for a traffic offense, they seized cocaine, heroin, cash, firearms, and other drug paraphernalia.
 
 
 5
 As part of the investigation, a court-authorized wiretap was conducted on a telephone at an apartment shared by Karl Wingo and Venus Coleman, the Conner Apartment. Wiretap evidence linked Karl Wingo's drug distribution with various locations in Detroit. On November 30, 1990, federal search warrants were executed at six locations used by Wingo's group. Cocaine was found in Kim Wingo's purse and in the locked compartment of Brett Lang's motorcycle. Also seized were drug records, cash, scales, guns, and other items.
 
 
 6
 Intercepted post-raid telephone conversations include Karl Wingo, Kim Wingo, Brett Lang, and Venus Coleman reacting to the searches: Karl saying that "all [his] boys" were hit; Kim warning the heroin supplier not to come to Detroit; Brett Lang and Venus Coleman indicating their involvement in a plan to prevent the forfeiture of assets by "covering" them with her legitimate income.
 
 
 7
 Several of the defendants used firearms to protect their drugs. Karl Wingo provided guns to his workers, giving Terry Harris a 9-mm gun for a two kilogram cocaine deal and providing guns to "Chuckie" to use at a drug distribution house on Hoover Street in Detroit. Karl Wingo and Brett Lang used a firearm to protect themselves during a planned purchase of heroin on May 3, 1990. The police seized a 9-mm Browning handgun when they arrested Karl Wingo and Brett Lang for transporting 100 grams of heroin. During an intercepted telephone conversation, the two also discussed "smoking" a rival drug dealer. Karl Wingo also reached for a gun to protect himself during the execution of a search warrant at the Conner apartment on November 30, 1990.
 
 
 8
 Other defendants were also convicted on firearms charges. Kim Wingo possessed firearms in the "crack" house she operated in Hamtramck, Michigan. During a wiretap intercept, she threatened to "blow people away" in order to collect a drug debt. Otis Wingo carried an assault rifle in his jeep, a 9-mm "AP9," which resembles an Uzi. He and Michael Zajac, a co-defendant who pled guilty and testified against the others, bought an AR 15 semi-automatic assault rifle in 1991. Evidence was introduced that Otis Wingo, because of his willingness to use Zajac's arsenal of guns, went to Zajac's house to protect him from a rival drug dealer.
 
 
 9
 Initially, sixteen people were indicted and charged with various offenses arising from a conspiracy to possess and distribute drugs. Of those sixteen, four pled guilty, one died before he could be arrested, and eleven chose to go to trial. All eleven were convicted; nine have appealed their convictions. The eight Appellants here were tried together under a superseding indictment containing sixty-two counts. Each was convicted by a jury after a seven-week trial. All eight have timely appealed. Jimmy Howard's appeal, although consolidated with these eight for oral argument, will be addressed separately, as his trial was separate from that of the eight Appellants here. These eight consolidated appeals raise several common issues.
 
 I. Sufficiency of the Evidence
 
 10
 Six of the Appellants challenge their conviction based on the sufficiency of the evidence against them. The standard of review on questions of sufficiency of the evidence is narrow. In criminal cases such as this one, we look only to whether, after reviewing "the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." United States v. Beddow, 957 F.2d 1330, 1334 (6th Cir.1992) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Indeed, even "circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.' " United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989) (quoting United States v. Stone, 748 F.2d 361, 363 (6th Cir.1984)).
 
 
 11
 Karl Wingo challenges his conviction under 18 U.S.C. Sec. 924(c) for a weapon found at the Conner Apartment during the DEA raid on November 30, 1990. He claims there was no connection made between the handgun found under the bed and any drug trafficking offense.
 
 
 12
 Although "some relationship" must be established between the firearm and the predicate drug offense, "this burden is not difficult, especially in drug cases." United States v. Sims, 975 F.2d 1225, 1240 (6th Cir.1992), cert. denied, 113 S.Ct. 1315 (1993). It is not necessary that drugs be seized at the same time and place as the weapon. See, e.g., United States v. Christian, 942 F.2d 363, 365-66 (6th Cir.1991), cert. denied, 112 S.Ct. 905 (1992) (finding a 924(c) violation where $60,000 and a gun were found separate from any drugs). Rather, the question is whether the defendant used the weapon as "an integral part of his criminal undertaking." United States v. Acosta-Cazares, 878 F.2d 945, 952 (6th Cir.), cert. denied, 493 U.S. 899 (1989). While drugs were not seized during the instant search, drug records, pagers, a counter-surveillance device, and $7,500 in drug proceeds were seized. Telephone intercepts established that the apartment was used to hide drug proceeds. Finally, testimony of cooperating witnesses links Karl Wingo and the apartment to prior drug transactions. The case relied on by Karl Wingo is distinguishable. United States v. Clemis, 11 F.3d 597 (6th Cir.), cert. denied, 114 S.Ct. 1850 (1994), did not involve any drug paraphernalia, nor was there any evidence of drug transactions taking place at the residence.
 
 
 13
 Kim Wingo contests her conviction under 18 U.S.C. Sec. 924(c) for weapons found at her house in Hamtramck, Michigan. During a February 25, 1988 search, officers of the Wayne County Sheriff's Department found narcotics and numerous weapons in the bedroom belonging to and occupied by Kim Wingo. However, she also argues that the weapons found were not shown to be used or carried during or in relation to a drug trafficking offense.
 
 
 14
 The evidence was sufficient to show that the firearms were used "in relation to" a drug trafficking crime. See United States v. Henry, 878 F.2d 937, 944 (6th Cir.1989) (approving the "fortress" theory interpretation of this clause). Evidence was presented establishing that Kim Wingo used this residence as a "drug house" to sell "crack" cocaine on a continuing basis. A search warrant executed less than two weeks later yielded drug records and additional "crack" cocaine that Kim Wingo admitted possessing.
 
 
 15
 Ronald Wingo argues that he merely "cooked up" drugs solely to further his own addiction. While conceding that there was evidence that he exchanged one-half ounce of heroin for $4,000 with undercover agent Steven Mitchell, Ronald Wingo relies on a twenty-year-old Second Circuit decision for the proposition that "a single transaction is insufficient evidence to infer that [he] knew of the broader and larger scope of the conspiracy." United States v. Torres, 503 F.2d 1120 (2d Cir.1974).
 
 
 16
 The evidence Ronald Wingo mentions, his participation in one drug transaction and his practice of "cooking" cocaine for Michael Zajac, is sufficient. There is also additional evidence of Ronald Wingo's knowledge of and participation in the conspiracy. There was testimony at trial that Ronald Wingo "cut" and packaged heroin for resale, was present when heroin was being sold, and personally sold "crack" cocaine for the conspiracy. In intercepted telephone conversations, Ronald Wingo indicated his willingness to assist in retaliating against a rival dealer.
 
 
 17
 Brett Lang challenges his conviction for possession with intent to distribute a controlled substance in violation of 21 U.S.C. Sec. 841(a)(1). This conviction stemmed from cocaine found in the locked compartment of Brett Lang's motorcycle. The motorcycle was confiscated during the execution of a search warrant at the Hoover Street house. When a warrant was executed at Brett Lang's apartment in Southfield, the key to the locked compartment was found. Lang claims there is insufficient evidence to connect him to either the cocaine in the motorcycle or the Hoover Street house near the time of the raid. This is not the case, however, as the evidence is sufficient to establish constructive possession of the cocaine found. It was undisputed that the motorcycle belonged to Brett Lang; all of the conspirators referred to it as his; the only key ever found was at his apartment. Based upon an intercepted telephone call in which he and Karl Wingo discussed the raid after it occurred, a reasonable juror could also infer that Lang knowingly possessed the cocaine seized. There is also evidence that Lang had been at the Hoover Street house the night before the search, and that he sold drugs there on an almost daily basis.
 
 
 18
 Ezra Henry first claims that the evidence merely showed him to be a drug user who occasionally sold small quantities of drugs to support his own habit. At most, he says, the evidence shows knowledge of the criminal activities of the conspirators, but not agreement or participation in the conspiracy. This defense was presented to the jury and rejected. Ezra Henry's own brief states ample evidence to establish his participation in the conspiracy: evidence of his receiving and distributing heroin. Beyond this, police officers found evidence of drugs and drug distribution paraphernalia in his possession on three separate occasions. This evidence combines to indicate that Henry was a drug distributor rather than a mere user.
 
 
 19
 Second, Henry challenges his conviction for unlawful use of a telephone in violation of 21 U.S.C. Sec. 843(b). This conviction cannot stand, he argues, because it is based on a "cryptic" telephone conversation between Karl Wingo and a person identifying himself as "Bobby." At trial Agent Steven Mitchell identified "Bobby" as Ezra Henry based on the recorded voice. Henry questions the reliability of this identification. However, corroborating evidence supports Agent Mitchell's positive identification of the voice on the tape as that of Henry. After the conversation, in which Karl Wingo told "Bobby" he would meet him shortly, surveillance showed Wingo proceeded to Henry's house. The substance of the conversation, discussing a price of $33,000 for a kilo of cocaine, was verified in subsequent telephone calls between other conspirators. A rational jury could convict based on this evidence.
 
 
 20
 Venus Coleman argues that money laundering alone is insufficient to establish that a person is a member of a drug conspiracy. United States v. Todd, 920 F.2d 399, 406 (6th Cir.1990). "The government must demonstrate a 'sufficient link' between [Coleman's] money-laundering and the drug distribution conspiracy in order to prove that [she] was part of the conspiracy." Id. She further contends that the evidence was insufficient to convict her for money laundering. She maintains that the government relied solely on the discrepancy between her reported income and expenditures to support this charge and lacked evidence to connect the excess income to drug proceeds.
 
 
 21
 We find that trial testimony and intercepted telephone conversations establish a "sufficient link" between Coleman's money-laundering and the drug conspiracy. These indicate that Coleman was aware of the scheme to hide assets in her name, "covering" them with her legitimate income. The telephone conversations establish that many of the purchases were made on behalf of Karl Wingo, who reported no income during the conspiracy. Coleman also discusses "covering" drug money seized from Brett Lang. Moreover, in one year, the amount of the "excess income" she claims cannot be connected to drug proceeds is double that of her reported income.
 
 
 22
 Karl Wingo makes a similar argument challenging his conviction for money laundering. He claims it should be reversed because the government did not trace the money to any specific drug deal. Therefore, it may have been proceeds from illegal gambling activity. However, even the case cited by Wingo supports conviction despite the failure to trace the money to any particular drug deal. United States v. Beddow, 957 F.2d 1330 (6th Cir.1992). Furthermore, the fact that the evidence supports theories other than guilt is not enough to warrant reversal for being insufficient. Stone, 748 F.2d at 363. There was evidence that Karl Wingo "covered" drug proceeds through Venus Coleman and others. The evidence was clearly such that a rational trier of fact could find that Karl Wingo used drug money to buy assets and place them in the names of other people, and that Venus Coleman knowingly participated in this scheme.
 
 II. Variance
 
 23
 Four Appellants challenge their convictions on the ground that there was a prejudicial variance between the indictment and the proof offered at trial. Brett Lang and Venus Coleman argue that the evidence established multiple smaller conspiracies to which they were a part rather than a single large conspiracy. Ronald Wingo and Ezra Henry similarly find error in the admission of testimony concerning criminal activity prior to the existence of the conspiracy as alleged in the indictment.
 
 
 24
 Whether single or multiple conspiracies have been shown is a question of fact to be resolved by the jury, and it is not necessary for each conspirator to participate in every phase of the conspiracy. United States v. Hughes, 895 F.2d 1135, 1140 (6th Cir.1990). The government need not prove that each defendant knew the full scope of the conspiracy, or even the purpose of other members of the conspiracy. United States v. Sermetaro, 625 F.2d 104 (6th Cir.1980). We cannot say that the jury's decision finding Appellants were part of one conspiracy rather than many is clear error.
 
 
 25
 There was no abuse of discretion in admitting co-conspirators' background testimony of drug dealing activities that took place shortly before the conspiracy allegedly began. The jury is entitled to know the setting of the case. The evidence was admissible to show the background and development of the conspiracy. United States v. Paulino, 935 F.2d 739, 743 (6th Cir.1991); United States v. Hitow, 889 F.2d 1573, 1578-79 (6th Cir.1989). This testimony was also proper under Federal Rule of Evidence 404(b) as evidence of the defendants' knowledge and intent to distribute drugs. United States v. Lash, 937 F.2d 1077, 1087 (6th Cir.), cert. denied, 112 S.Ct. 397 (1991). Finally, any error in allowing the testimony was harmless under Fed.R.Crim.P. 52(a); the references to prior drug dealing were minuscule compared to the evidence of major dealing during the conspiracy.
 
 III. Jencks Act Material
 
 26
 Karl Wingo, Kim Wingo, Otis Wingo, and Brett Lang each claim that their conviction should be reversed because the government failed to produce Jencks Act material. Michael Zajac, a co-conspirator and witness for the United States, was interviewed approximately ten times in preparation for the trial. Various law enforcement agents and an Assistant United States Attorney took notes during these interviews. Defense counsel moved for the production of these notes, arguing that they were either informally adopted by Zajac or "substantially verbatim recitals" of Zajac's statements. At an evidentiary hearing, this request was denied. Appellants allege that Zajac was given an opportunity to review the notes orally and was asked to verify the accuracy of the information written down; thus, they are adoptive statements of the witness.
 
 
 27
 To adopt a statement as his own, a witness must be familiar with its contents and affirmatively approve them. United States v. Padin, 787 F.2d 1071, 1078 (6th Cir.1986), cert. denied, 479 U.S. 823 (1986). It must be signed, or read by or to the witness. Id. The government maintains that "[d]uring the entire time of the various interviews neither the agents nor the [Assistant United States Attorney] read the notes to the witness in order for him to adopt or approve them." Nor were the notes being taken contemporaneously on a computer ever shown or read to the witness. The latter are characterized as a "typed questioning outline" rather than a substantially verbatim recital of the witness' statement. These interviews were of the type found not to meet the adoption requirement by the Supreme Court. See Goldberg v. United States, 425 U.S. 94, 110 n. 19 (1976) (noting that the same type of witness interview involved here does not constitute adoption or approval of the lawyer's notes).
 
 
 28
 As Appellants requested at oral argument, this Court has reviewed the sealed notes of these interviews. We believe these notes are not Jencks Act material. They constitute neither an adoptive statement nor a "substantially verbatim" recital of Zajac's responses. The notes taken on computer merely reflect an outline of questions and areas covered. Thus, the court's denial of the production of these notes as Jencks Act material is not clear error. United States v. Susskind, 4 F.3d 1400 (6th Cir.1993), cert. denied, 114 S.Ct. 1098 (1994).
 
 IV. Expert/Opinion Testimony
 
 29
 Karl Wingo, Robert Wingo, and Brett Lang each challenge the admission of testimony from DEA Agent Steven Mitchell concerning the meaning of certain code words in intercepted telephone conversations. Appellants object to testimony they characterize as the agent's interpretations and conclusions regarding these conversations. They argue that Agent Mitchell did more than testify as to the meaning of code words, and that his testimony intruded upon matters to be decided by the jury.
 
 
 30
 The admission of Agent Mitchell's expert testimony is reviewed for abuse of discretion, and is to be sustained unless manifestly erroneous. United States v. Pearce, 912 F.2d 159, 163 (6th Cir.1990), cert. denied, 498 U.S. 1093 (1991). This Court has allowed the use of expert testimony to aid the jury in understanding the operations of drug dealers. Id. Other circuits have allowed expert testimony specifically concerning the meaning of words or phrases used by drug dealers. United States v. Hughes, 970 F.2d 227, 235-36 (7th Cir.1992); United States v. Ladd, 885 F.2d 954, 959-60 (1st Cir.1989); United States v. Kusek, 844 F.2d 942, 949 (2d Cir.1988). In a bribery case, this Court held an agent's similar interpretation of the meaning of a defendant's statements to be proper. United States v. Graham, 856 F.2d 756 (6th Cir.1988), cert. denied, 489 U.S. 1022 (1989). Agent Mitchell was cross examined extensively by eleven defense attorneys as to his opinion; the court admonished the jury that it could accept or reject any expert opinion as it saw fit; and finally, the court told the jury that they had the ultimate decision as to the meaning of defendants' words and phrases. We find that the admission of Agent Mitchell's testimony was not an abuse of discretion.
 
 V. Wiretap Authorization
 
 31
 Karl Wingo and Venus Coleman each challenge the admission of evidence gathered pursuant to the wiretap, claiming that it was improperly authorized. They argue that the affidavit in support of the wiretap application failed to state specifically why normal investigative procedures would prove inadequate, and that it failed to comply with the necessity requirement of the Federal Wiretap Act. 18 U.S.C. Sec. 2518(1)(c). Both cite United States v. Kalustian, 529 F.2d 585, 590 (9th Cir.1975), and claim the affidavit contains only conclusory assertions, rather than facts, concerning the necessity of the wiretap.
 
 
 32
 We find that the affidavit fully complied with the necessity requirement. See United States v. Alfano, 838 F.2d 158, 163-64 (6th Cir.), cert. denied, 488 U.S. 821 (1988) (requiring only that serious consideration be given to non-wiretap techniques). The fact that an affidavit may contain some statements equally applicable to any drug case does not render it insufficient. The instant affidavit contains information about particular facts of this case demonstrating the consideration given to normal investigative procedures. These facts show essentially that normal procedures had been exploited as far as they could, but could not determine the full extent of the conspiracy. The affidavit refers to the use of counter-surveillance, and the unwillingness of informants to testify because of fear of reprisal, as further proof of the necessity of the wiretap.
 
 
 33
 In addition to challenging the necessity of the wiretap, Coleman also questions whether it was authorized properly, and if the minimization requirement was met. She claims an evidentiary hearing should have been held on the matter. Her claims in this respect fail. The application was specifically approved by Criminal Division Deputy Assistant Attorney General Paul L. Mahoney, who held a position specifically delegated authority to approve wiretaps by then-Attorney General Thornburgh. Coleman also does not identify any conversations that should not have been intercepted. Having failed to "show a prima facie pattern of insufficient minimization over the period of the surveillance," United States v. Giacalone, 853 F.2d 470, 482 (6th Cir.), cert. denied, 488 U.S. 910 (1988), Coleman was not entitled to an evidentiary hearing. The wiretap order described the types of conversations to be seized with sufficient particularity. Id. at 481. Thus, the district court properly denied Coleman's motions for an evidentiary hearing as it contained only conclusory allegations as to minimization.
 
 VI. Severance
 
 34
 Venus Coleman and Andre Olden argue that they were prejudiced by the district court's denial of their motions for separate trials. Coleman claims that this compromised her right to a fundamentally fair trial. Olden maintains that it prevented him from having effective assistance of counsel by denying him time to prepare a defense to charges that he alleges were not made known to him until trial. Given a separate trial, he maintains, his co-defendants might have testified in his favor as part of his defense.
 
 
 35
 Denial of a motion for severance is reviewed for abuse of discretion. United States v. Salman, 870 F.2d 1047, 1053 (6th Cir.), cert. denied, 492 U.S. 921 (1989). This Circuit has interpreted Federal Rule 8(b) of Criminal Procedure as a broad rule in favor of joinder. United States v. Moreno, 933 F.2d 362 (6th Cir.), cert. denied, 112 S.Ct. 265 (1991). Moreover, the Supreme Court recently reaffirmed a preference for joint trials in Zafiro v. United States, 113 S.Ct. 933 (1993). Generally, in conspiracy cases, parties indicted together should be tried together. United States v. Dempsey, 733 F.2d 392, 398 (6th Cir.), cert. denied, 469 U.S. 983 (1984). Also, limited involvement in a conspiracy does not necessarily warrant severance. United States v. Grunsfeld, 558 F.2d 1231, 1237 (6th Cir.), cert. denied, 434 U.S. 872 (1977). As to Olden's claim, the possibility of favorable testimony by a co-defendant does not require a severance. United States v. Causey, 834 F.2d 1277, 1287 (6th Cir.1987), cert. denied, 486 U.S. 1034 (1988). Olden states only that favorable testimony might have been available; such a possibility does not warrant severance. Appellants have failed to make out the necessary showing of "substantial prejudice." United States v. Gallo, 763 F.2d 1504, 1524 (6th Cir.1985), cert. denied, 475 U.S. 1017 (1986). The district court did not abuse its discretion in refusing to grant them separate trials.
 
 VII. Other Issues Raised
 A.
 
 36
 Brett Lang claims that the district court improperly sentenced him under the Sentencing Guidelines. He argues that the court attributed to him a greater quantity of drugs than it should have, specifically, large amounts of heroin. In essence, he claims never to have conspired to distribute heroin, only cocaine, and that in imposing sentence, the court failed to make specific findings of fact as required by the Guidelines.
 
 
 37
 The amount of drugs a defendant is accountable for is a finding of fact which this Court must accept unless clearly erroneous. United States v. Walton, 908 F.2d 1289, 1301 (6th Cir.), cert. denied, 498 U.S. 906 (1990). There was sufficient evidence that Brett Lang and Karl Wingo shared in the leadership of this drug operation to "impute knowledge to [Lang] regarding the total quantity of drugs in the conspiracy." United States v. Warner, 10 F.3d 1236, 1240-41 (6th Cir.), cert. denied, 114 S.Ct. 2176 (1993). There is also ample evidence connecting Lang to Karl Wingo's heroin activities. Further, the district court attached an eleven-page "Exhibit A" to Lang's Presentence Report specifically finding as fact which amounts of drugs were within his participation in the conspiracy. Given the testimony of Michael Zajac and others connecting Lang to various heroin transactions, and his arrest with Karl Wingo by the Detroit Police after purchasing one hundred grams of heroin, there is a preponderance of evidence to support the court's findings.
 
 
 38
 Brett Lang further argues that his trial counsel's "failure to litigate a [F]ourth [A]mendment claim competently" amounted to ineffective assistance of counsel. This claim, however, is not properly before this Court. Ineffective assistance of counsel claims are properly resolved in 28 U.S.C. Sec. 2255 proceedings when they are not first presented to the district court. United States v. Sanchez, 928 F.2d 1450, 1458 (6th Cir.1991); United States v. Swidan, 888 F.2d 1076, 1081 (6th Cir.1989). Further, there was conflicting evidence regarding observations made by Detroit Police in deciding to stop and search Lang's vehicle. Thus, the Fourth Amendment claim raised by Lang involves credibility issues that cannot be addressed for the first time on direct appeal. Lang also fails to demonstrate that his counsel was indeed deficient and how this prejudiced his defense. Chandler v. Jones, 813 F.2d 773, 781 (6th Cir.1987). For counsel's errors to amount to ineffective assistance, they must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington, 466 U.S. 668, 687 (1984). Lang has made no such showing.
 
 B.
 
 39
 Venus Coleman asserts that the government's use of grand jury testimony taken in violation of her Fifth Amendment privileges was reversible error. She claims that the Assistant United States Attorney ignored her repeated invocation of the Fifth Amendment. Coleman argues that the government's failure to inform her that she was a "target defendant" prevented any waiver she made from being knowing, intelligent, and voluntary as required by United States v. Washington, 431 U.S. 181, 188 (1977). She further asserts that the "impropriety" of asking how her answers might incriminate her, as well as persisting with additional questions, amounted to prosecutorial misconduct before the grand jury and was so fundamentally unfair that her answers should have been precluded.
 
 
 40
 While the Fifth Amendment extends to Grand Jury proceedings, it does not automatically preclude self-incrimination. It merely prevents compelled self-incriminating testimony. The privilege must be raised on a question-by-question basis; it may not be asserted in advance of questions. United States v. Harmon, 339 F.2d 354, 359 (6th Cir.1964), cert. denied, 380 U.S. 944 (1965). A witness may not invoke a blanket refusal to testify in any judicial proceeding. North River Ins. Co. v. Stenfanou, 831 F.2d 484, 486-87 (4th Cir.1987), cert. denied, 486 U.S. 1007 (1988). Although Coleman repeatedly pled the Fifth, she also continued to answer other questions. The district court properly admitted the answers that Coleman chose to give.
 
 
 41
 Coleman further objects to the district court's preliminary instruction to the jurors advising them that transcripts of testimony would not be available during their deliberations, so they should pay close attention. However, Coleman misinterprets what the court actually said: to pay attention because contemporaneous transcripts were not being made. Further, no objection was ever made to this instruction. The jury was allowed to take notes and never indicated any problem recalling testimony. And finally, the Second Circuit case relied on by Coleman is distinguishable. There, the court prohibited any re-reading of testimony after the defendant advised the jury during closing arguments to request a re-reading. United States v. Criollo, 962 F.2d 241 (2d Cir.1992).
 
 C.
 
 42
 Andre Olden argues that the government was guilty of prosecutorial misconduct mandating a reversal of his conviction. The original indictment named a "Carlos" as a co-defendant of Olden, but the name "Carlos" was omitted from the superseding indictment. Olden claims that the government constructively amended the indictment when evidence was introduced at trial to establish that "Carlos" was actually Olden. Attempts to discredit the government witnesses' identification were thus hindered: Olden's efforts to produce someone else as possibly being "Carlos" failed; the government showed that one possibility was actually the name on a false identification card of Karl Wingo, and another was in prison at the time of the charged offense.
 
 
 43
 Olden's claim is unsupported. The agents who saw "Carlos" deal drugs, and who identified Olden as "Carlos," did not meet a person identifying himself as Andre Olden until the original indictment was returned. They informed the Grand Jury that "Carlos" was in fact Olden; the Grand Jury then deleted "Carlos" as a separate defendant from the superseding indictment. Thus, because the Grand Jury made its own amendment, there was no "constructive" amendment by the government. Olden was provided with this Grand Jury transcript before the trial and noted that Andre Olden was being identified as "Carlos." Furthermore, as part of early Jencks disclosure, on the day before the trial, the government also supplied the testifying agents' supplemental report on this matter to Olden. Finally, Olden does not indicate how he would have tried the case differently had he known this information before trial.
 
 
 44
 Olden also claims that comments made during the government's closing argument were calculated to unduly prejudice the jury and warrant reversal. Olden points to places in the closing argument where the Assistant United States Attorney commented on Olden's defense strategy--claiming to be misidentified and suggesting other people as potentially being the "Carlos" named in the original indictment.
 
 
 45
 Again, there was no objection raised at trial regarding the government's closing argument. Thus, this is reviewed for plain error. Fed.R.Crim.P. 52(b). Olden claims in effect that the government should not be allowed to refute a defendant's defense. However, a prosecutor may summarize the evidence in closing and "comment upon both its quantitative and qualitative significance." United States v. Drake, 885 F.2d 323, 324 (6th Cir.1989), cert. denied, 493 U.S. 1033 (1990). The prosecution's comments merely reiterated that Olden's attempts to find some other "Carlos" to blame had been refuted by the government's proofs. Such comments were properly allowed. See United States v. Veal, 23 F.3d 985, 988 (6th Cir.1994) (finding a similar attempt to discredit a defendant's explanation proper as it represented a relatively minor point in a long and complex trial).
 
 D.
 
 46
 Otis Wingo alleges that he was denied Due Process when the government informed a witness before she testified that she might be subject to prosecution. He claims this was an effort to prevent her from testifying by inducing her to invoke her Fifth Amendment privileges. Otis Wingo asserts that this prevented him from having the witness' full and complete testimony. He claims that the government's actions infringed his rights to compulsory process and to present evidence.
 
 
 47
 The witness involved was Debra Spokaeski, Michael Zajac's girlfriend. Otis Wingo asked the government to help him contact her for an interview. In attempting to do so, the government had an IRS agent leave a message with Zajac, who asked whether Spokaeski was required to meet with the defense attorney. The agent then explained the options available to Spokaeski as to whether to speak with Wingo's attorney. When Spokaeski was served with a trial subpoena, Zajac contacted the Assistant United States Attorney to inquire about immunity. Otis Wingo claims that Ms. Spokaeski overheard this conversation, noting that she would not obtain immunity and was "open for prosecution." After learning that Spokaeski had then obtained counsel and intended to invoke her Fifth Amendment privileges, the district court conducted a hearing concerning the government's alleged misconduct. The court found that while not granting immunity might chill a witness' willingness to testify, there was no improper conduct on the part of the government.
 
 
 48
 The district court's finding is not clearly erroneous. While threats of prosecution would violate a defendant's due process rights when made to prevent a defense witness from testifying, Webb v. Texas, 409 U.S. 95 (1972), the Appellant must still make a showing of prejudice as a prerequisite for reversal. United States v. Valenzuela-Bernal, 458 U.S. 858, 873 (1982). This Court notes that Ms. Spokaeski did testify on behalf of Otis Wingo, who fails to specify what testimony he did not receive or the manner in which he was prejudiced.
 
 
 49
 For the foregoing reasons, the decision of the district court is AFFIRMED.